**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BRANNDON W. HOCH, | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 19-3220 |
| | : | |
| CARPENTER TECHNOLOGY | : | |
| CORPORATION | : | |
| *Defendant.* | : | |

**MEMORANDUM**

Plaintiff Branndon Hoch brought this action against Defendant Carpenter Technology Corporation, alleging Carpenter terminated his employment because of his epilepsy, in violation of the Americans with Disabilities Act. Mr. Hoch tried his claim to this Court on July 12 and 13, 2021. This Memorandum constitutes our findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1). To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

For reasons that will be discussed, we find that Defendant intentionally discriminated against Plaintiff in violation of the ADA when it terminated Hoch's employment. We will award Plaintiff back pay (with interest), front pay, and attorney's fees and costs.

I.      **FINDINGS OF FACT**

1.      In October 2013, Plaintiff Branndon Hoch ("Hoch") obtained a position through a temporary employment agency in Defendant Carpenter Technology Corporation's ("Carpenter") Reading, Pennsylvania facility. After seven or eight months, Carpenter offered Hoch a position as a Carpenter employee in its Forge Finish facility. Trial Tr. vol. 1, 15, 16, July 12, 2021, ECF No. 32.

2.      Carpenter makes specialized steel for aircrafts. Hoch operated several different types of machines while working at the Forge Finish Facility. *Id.* at 16.

3.      On several instances from 2014 to 2016, Hoch received verbal coaching for using his cell phone during working hours in violation of Carpenter policy and ultimately signed a Written Corrective Performance Review from his supervisor for his cell phone use. *Id.* at 8–9.

4.      On September 9, 2015 Hoch received a memorandum that identified five unexcused absences and two early departures over the preceding nine months. The memo noted his absenteeism had "risen to a level of concern." Joint Trial Ex. 19.

5.      In March 2017, Hoch began to experience seizures in his sleep and was diagnosed with epilepsy. Trial Tr. vol. 1, 26. Hoch's epilepsy is a permanent condition which he treats with medication *Id.* at 30.

6.      After a seizure, Hoch spends between three and five days in bed and is unable to work. *Id.* at 29.

7.      Carpenter approved FMLA leave for Hoch, and he was out of work on continuous medical leave from March 6, 2017 to June 9, 2017. Hoch exhausted his FMLA leave on May 19, 2017 but Carpenter permitted Hoch to extend his medical leave into June 2017. *Id.* at 30.

8.      Hoch bid for and accepted an offer for a Floorperson South Forge position, which accommodated his permanent medical restrictions of no night shift work or shifts exceeding eight to ten hours per day. *Id.* at 88–89.

9.      Hoch discussed his restrictions with Jan Franks ("Franks"), Carpenter's Human Resources representative, and with Scott Weller, his area manager. *Id.* at 32.

10.     Hoch was approved for additional intermittent FMLA leave related to his epilepsy from September 26, 2017 to September 25, 2018. *Id.* at 34.

11.     Hoch exhausted his FMLA leave on October 9, 2017. Joint Trial Ex. 15.

12.     After his physicians placed Hoch on a new medication for his epilepsy in October 2017, they recommended he stay out of work until his medication "balanced out." Hoch's last seizure was in October 2017. Trial Tr. vol. 1, 30, 39.

13.     Hoch was out of work on short term disability for his epilepsy from October 9, 2017 to January 8, 2018 when he returned to work under physician-imposed restrictions against operating an overhead cab crane and starting work before 4 AM or ending after 1 AM. *Id.* at 36–37; *see also* Def. Ex. 7, at 2–3, ECF No. 29-23.

14.     Roger Saul, Hoch's Area Manager—a rung above Hoch's supervisor in the chain of command—approved Hoch's return to work. Trial Tr. vol. 1, 38.

15.     Hoch did not believe his disability affected his ability to perform his duties and felt that Carpenter, for the most part, accommodated his work restrictions. *Id.* at 39–40.

16.      Hoch received a Corrective Performance Review, dated March 5, 2018, for "excessive absenteeism" that identified eight absences between June 2017 and January 2018. Joint Trial Ex. 23.

17.     Each identified absence, except for one absence to receive eye surgery, was related to Hoch's epilepsy. Hoch had notified his supervisors of the reason for each absence and was therefore confused by the Corrective Performance Review that cited him for violating Carpenter's attendance policy. Hoch believed that because the identified absences were FMLA-excused, he had not violated Carpenter's attendance policy. Trial Tr. vol. 1, 41–46; *see also* ECF No. 29-11, Ex. 3C.

18.     On April 19, 2018 Hoch received verbal coaching from a supervisor, Nate Romig, for missing instructions to cut pieces on the top of two billets. ECF No. 29-11, Def. Ex. 3C, at 10.

19.     In early August 2018 Hoch was scheduled for a 2 AM to 2 PM shift which conflicted with his permanent medical restrictions. *Id.* at 40.

20.     Hoch spoke with Romig, one of two supervisors responsible for scheduling hourly employees, who corrected the error and scheduled Hoch for the medically permissible 4 AM shift. Trial Tr. vol. 2, 76–77, July 13, 2021, ECF No. 33.

21.     Romig knew Hoch had epilepsy and could not take on the night shift from 10 PM to 4 PM. He learned of Hoch's condition from Hoch himself. *Id.* at 80–81.

22.     Another supervisor, Cory Hohenhadel, exclusively worked the night shift and assisted with scheduling hourly employees for night shifts. During the operative period, Romig was the primary Carpenter employee responsible for Forge Finish shift scheduling. *Id.* at 66.

23.     Because of the scheduling error, other Carpenter workers had to cover the overnight shift. *Id.* at 76–77.

24.     Hoch was concerned that he had been scheduled for an overnight shift given that Carpenter management knew of his permanent medical restrictions. *Id.* at 39–40.

25.     Carpenter employees understood the company to be highly focused on production numbers. At least one employee who missed work for FMLA leave lost his position because his absences from his critical role affected production. *Id.* at 12–14.

26.     On August 7, 2018, Hoch signed another Corrective Performance Review, dated August 2, 2018, from Roger Saul and Franks for excessive absenteeism, for absences on July 31, 2017, August 5, 2017, August 10, 2017, August 12, 2017, August 17, 2017, October 3, 2017, January 29, 2018, and July 7, 2018. Except for one date, these absences were the same as those identified in Hoch's March 5, 2018 Corrective Performance Review. *See* Joint Trial Exs. 23, 26.

4

27.     Hoch asked Romig whether he could meet with HR about his absences to inquire why they were not covered by FMLA. Trial Tr. vol. 1 49; Trial Tr. vol. 2, 81–82.

28.     Carpenter's attendance policy does not require that absences result in corrective action. *See* ECF No. 29-11, Ex. 3C ("When an employee has accumulated five occasions of absences . . . supervision will meet with the employee to discuss the absenteeism.  This discussion may or may not result in corrective action dependent on the employee's prior attendance record and circumstances surrounding the absenteeism.").

29.     Hoch wanted to speak with Franks to see whether Carpenter could deem the absences as "work not scheduled" so the absences would not be included as occurrences that would result in a Corrective Performance Review. *Id.* at 50–51.

30.     Franks and Hoch had spoken in the past about Hoch's attendance, and Franks believed Hoch knew he could reach out to her directly. *See* Trial. Tr. vol. 2, 106–07.

31.     Hoch asked Romig, or another supervisor, to set up a meeting with HR. The supervisor told Hoch he would "get back to [Hoch] with a time and date" but never did because Hoch was terminated. *See* Def. Ex. 12C, at 2, ECF No. 29-32. Carpenter never provided Hoch with an opportunity to speak with HR regarding the August 2, 2018 Corrective Performance Review, but Hoch also did not reach out to Franks directly. *Id.* at 51; Trial Tr. vol. 2, 106–07.

32.      During an August 9, 2018 shift, Hoch was assigned to change the grinding wheel head on a fixed head grinder, a large industrial grinder that grinds bar sizes down to smaller, more manageable bars. Def. Ex. 12C, at 52.

33.     Hoch had changed the grinding wheel head on the fixed head grinder between fifty and sixty times between 2014 and 2018. *Id.* at 52–53.

34.     Between 4:30 and 5:30 PM, Tony Sisko, a supervisor in the Forge Finish department, arrived at the fixed head grinder, where Hoch was approximately fifteen minutes into the grinding wheel change procedure, to conduct a safety observation. *Id.* at 54–55.

35.     Carpenter supervisors were required to conduct random safety observations on any employee engaged in any operation at least once per week and to document the observation. Trial Tr. vol. 2, 36. Safety observations were considered opportunities for coaching rather than discipline. *Id.* at 87.

36.      Safety observation documentation was not placed in the observed employee's personnel file because it was not "part of the standard procedure." The documents were retained in a separate file. *Id.* at 86–87.

37.     When Sisko arrived at the fixed head grinder, Hoch was already in the middle of the wheel change procedure and had "just place[d] the wheel on the cart and position[ed] the wheel back, ending enclosure to be reassembled." Def. Ex. 9, at 2, ECF No. 29-26; *see also* Trial. Tr. vol. 1, 55.

38.     After the electrical power is locked out and the machine is placed into position to continue with the wheel change, the Carpenter employee performing the procedure then locks out the hydraulics to prevent any power to the machine and to keep the head from drifting up and down when the motor was shut off. *Id.* at 57–58.

39.     At the Reading facility, maintenance employees used both "personal locks" and "shop locks." Trial. Tr. vol. 1, 111. Both personal and shop locks were Master-brand locks with keys. Each Carpenter employee had a personal lock labeled with its owner's name, work location, and employee number. Trial Tr. vol. 2, 19–20.

40.     While shop locks and personal locks both provide the same protections from a mechanistic standpoint, Carpenter wants its employees to use personal locks as "checks and balances" to ensure the employees' personal accountability for their own safety. Trial. Tr. vol. 1, 111–12.

41.     To lock out the hydraulics, the Carpenter employee would turn the valves and affix a Master lock, remove the key to the lock, and place that key in a separate yellow lockbox that was attached to the side of the enclosure, which was itself then locked. *Id.*; *see also* Def. Ex. 9, at 2, ECF No. 29-26.

42.     When multiple employees participated in the lockout/tagout procedure, the yellow lockbox would be locked with each employee's personal lock, and with a shop lock. Trial Tr. vol. 2, 26–27.

43.     During the employee onboarding process, Carpenter's safety group provides training on the lockout/tagout procedure. *Id.* at 112–13.

44.     Carpenter's document "Fixed Head Grinder Lockout Procedure for Wheel Change" directs employees performing the procedure to apply their personal locks to the lockboxes. *See* Def. Ex. 10, at 7, ECF No. 29-7.

45.     Hoch trained Zeke Sheaman, another Carpenter employee, to perform the wheel change on a fixed head grinder. *Id.* at 21. Romig, who at the time was a new supervisor and an acting manager, observed the two as they performed the wheel change using a shop lock on the lockbox without objecting to Hoch's process. Trial Tr. vol. 1, 24–27, 65.

46.     Sheaman does not remember that he was ever told to use a personal lock on the lockbox rather than a shop lock nor was he ever told it was improper to use a shop lock on the lockbox while performing a wheel change. Trial Tr. vol. 2, 22.

47.    At the point where Sisko began observing Hoch, Hoch had already locked out the electrical power. Trial. Tr. vol. 1, 57.

48.    Hoch gestured to Sisko to follow him as he walked to the north side of the grinder enclosure. Def. Ex. 9, at 2, ECF No. 29-26; Trial. Tr. vol. 1, 57.

49.    As Hoch locked out the multiple isolation devices to perform the wheel assembly, he placed each key in a lock box that was fixed to the side of the grinding wheel enclosure. *See* Trial Tr. vol. 1, 58–59.

50.    After placing the keys in the lockbox, and locking the box with a shop lock, Hoch walked through the man door to reassemble the wheel. Trial Tr. vol. 1, 63. *Compare* Trial Tr. vol. 2, 56, *with* Def. Ex. 9, at 2, ECF No. 9 (testifying at deposition and trial inconsistently with the incident documentation as to whether Hoch first closed the lockbox or left the lockbox open).

51.    As Hoch walked through the man door, Sisko yelled at Hoch to stop and pointed out that he had not put his personal lock on the lockbox before entering the man door. Hoch paused and looked at the shop lock that was hanging on the box. Trial Tr. vol. 1, 64; Trial Tr. vol. 2, 44; Def. Ex. 9, at 2, ECF No. 9.

52.    Sisko asked Hoch where he had left his personal lock. Hoch responded that his personal lock was by another device, the CMI saw, which was on the opposite end of the building, separated by a ten-minute roundtrip walk. Trial Tr. vol. 1, 67.

53.    Sisko did not ask Hoch why he had used the shop lock instead of a personal lock to lock the lock box, about Hoch's training, or anything beyond the location of Hoch's personal lock. Trial Tr. vol. 2, 45, 60–61.

54.     Hoch's personal lock was by his workstation rather than on his person because the day shift supervisor called him before his shift to direct him to report to the fixed head grinder instead of to his usual workstation. Trial Tr. vol. 1, 68.

55.     Sisko sent Hoch to his workstation to retrieve his personal lock. *Id.*

56.     While Hoch went to retrieve his personal lock, Sisko went outside the facility's door to the parking lot to call Roger Saul, his own superior, leaving the lockbox as Hoch had left it. *See* Trial Tr. vol. 2, 63–64.

57.     Sisko told Saul of Hoch's purported lockout/tagout violation. Saul directed Sisko to contact Peter Vanderwesthuizen ("Vanderwesthuizen"), Saul's manager. Sisko called and informed Vanderwesthuizen of Hoch's lockout/tagout violation and asked Vanderwesthuizen what to do. Vanderwesthuizen directed Sisko to send Hoch home. Trial Tr. vol. 2, 45–46, 63–64.

58.     Sisko returned inside to the fixed head grinder and Hoch returned with his personal lock. After Hoch finished the wheel change procedure, Sisko told him to enter his paperwork, walked him to the locker room, and told him he was suspended until further notice. Trial Tr. vol. 1, 68–69.

59.     Sisko emailed a summary of his observation of the incident to Saul, and copied Franks, which is how she learned of the incident. *See* Def. Ex. 9, at 2, ECF No. 29-26; Trial Tr. vol. 2, 91.

60.     Hoch went home and heard nothing from Carpenter for three or four days. *Id.*

61.     In 2018, the Reading facility had two HR employees, Franks and Brian Engle, who were each responsible for respective areas of the facility. Terminations followed a general process. The HR representative would "do all the investigation, pull all the data, all the pertinent information and [ ] set up a call with" Jim America ("America"), the Vice President of HR for

9

Specialty Alloy Operations, to discuss the proposed termination. Franks or Engle would then review any proposed terminations at the Reading facility with America before a final decision was made to terminate an employee. The review included a consideration of "what happened," "contributing factors," whether there was a policy violation, "work behavior," and "work habits. Sometimes in-house counsel would join the discussion, but usually the HR representative would review America's recommendation with in-house counsel separately. Joint Trial Ex. 55, at 9–13.

62.    America did not review the files related to proposed terminations himself but rather listened as the HR representative described the documents. *Id.* at 14–15.

63.    On August 13, 2018, Franks emailed her manager, Jim America at 8:33 AM to ask for "[a]ny feedback on what we're doing with [Branndon Hoch's] Lock Out/ Tag Out violation?" Def. Ex. 11A, at 2, ECF No. 29-28. America replied at 10:34 AM that he was "waiting to hear from Mike Murtagh . . ." *Id.*

64.    America, whose management responsibilities included approximately 12 locations with a little over 3,000 employees, had only a vague recollection of Hoch because America "deal[t] with a lot of cases day in and day out." America does not specifically remember having a call to discuss Hoch's pending termination. Joint Trial Ex. 55, at 13–14.

65.    America had no other discussions or involvement with Hoch's employment at Carpenter, any awareness that Hoch had taken medical leave, whether Hoch had work restrictions, or needed any accommodations for a medical condition. *See id.* at 16–17.

66.    America does not remember discussing Hoch's termination with anyone other than Franks. *Id.* at 33.

67.    America believes lockout/tagout violations have "very, very serious slash catastrophic potential." As America understands Carpenter's process, "the boots on the ground"

person conducting the investigation determined whether the incident reached the level of a catastrophic violation. *Id.* at 19–20.

68.     America expects that a "combination of the department manager, supervisor, direct manager . . . and most of the time, safety" would participate in an investigation of a lockout/tagout violation. The HR rep would not participate in the investigation and would merely be provided with the data. *Id.* at 20.

69.     When asked what he expected would happen as part of the "normal protocol" for investigations of lockout/tagout violations, America proposed "obviously" the witnesses would be interviewed, and the responsible Carpenter employee to get his or her side of the story, whether there were "breakdowns in the system. Was it a management failure? Did we do proper training?" *Id.* at 21–22. The investigation would take place over the 48-to-72-hour period after an incident or violation. *Id.* at 22.

70.     On August 14, 2018, Franks emailed Vanderwesthuizen's boss, Jose Gutierrez ("Gutierrez"), the Vice President of Operations at the Reading facility, at 11:42 AM to ask him to confirm that Hoch was to be terminated due to the lockout/tagout violation. Gutierrez, with whom termination decisions are also supposed to be reviewed before being carried out, confirmed that Hoch was to be terminated due to the lockout/tagout violation during a verbal conversation taking place at 12:36 PM. *See* Trial Tr. vol. 2, 93–94; Def. Ex. 12A, at 2, ECF No. 29-30.

71.     Hoch called Franks and left her a voicemail on August 13, 2018. He followed up by email on August 14, 2018. Def. Ex. 11B, at 2, ECF No. 29-29.

72.     On August 14, 2018, Franks emailed Vanderwesthuizen's superior, Jose Gutierrez ("Gutierrez"), the Reading facility's Vice President, with a list of employees, their violations, and proposed discipline. She asked Gutierrez to confirm that Hoch would be terminated, which

Gutierrez confirmed in a verbal conversation early that afternoon. Trial Tr. vol. 2, 93–94; Def. Ex. 12A, at 2, ECF No. 32-30.

73.    Carpenter's Non-Compliance with Safety Standards policy provides that in the event of a catastrophic violation, "[a]n occurrence will result in a three-day unpaid suspension of the employee to be served on the first work day following the determination that a catastrophic violation occurred. During the suspension, the employee will develop a corrective action plan to present to the Vice-President of Manufacturing, their General Manager, and their Department Manager in a planned meeting. In addition, the employee will be subject to appropriate corrective action, typically the issuance of two steps of Corrective Performance." Def. Ex. 3E, at 3, ECF No. 29-13.

74.    Under the Non-Compliance with Safety Standards policy, Carpenter "reserves the right to suspend an employee with intent to terminate, if warranted." *Id.*

75.    Hoch had never been charged with committing a catastrophic safety violation. Trial Tr. vol. 1, 74.

76.    Catastrophic violations are not subject to appeal through Carpenter's Problem Resolution Procedure. Def. Ex. 3E, at 3, ECF No. 29-13; Trial Tr. vol. 1, 76.

77.    Because Hoch was charged with a catastrophic violation, he could not appeal his termination. Trial Tr. vol. 1, 75–76.

78.    Carpenter's Non-Compliance with Safety Standards policy defines a catastrophic violation as "one which has the potential to create a fatality hazard and/or represents an egregious violation of safe work behavior." Def. Ex. 3E, at 3, ECF No. 29-13.

79.    Carpenter does not consider all lockout / tagout violations to be catastrophic violations. Trial Tr. vol. 2, 98.

80.     Sisko did not consider Hoch's conduct to be "egregious" because all keys needed to power the machine down were in the lockbox. Trial Tr. vol. 2, 59–60, 63 ("[E]ven with the keys open . . . if somebody was to walk up, they wouldn't be able to go and turn it off. They would be – they should go back to the box and see if things are locked out . . . look at that box to see if there are keys in there. And if that was the case, then they technically shouldn't be operating that equipment. They should then be calling someone to see what was going on.").

81.     After Sisko sent Hoch home, he had no further conversations with Hoch before Hoch's termination. Sisko did not categorize Hoch's lockout/tagout violation as a "catastrophic violation" and Sisko was not involved in the decision to terminate Hoch. *Id*. at 48–49, 57–58.

82.     Franks did not conduct any independent investigation of Hoch's alleged lockout/tagout violation, and she is not aware of anyone who took any statement from Hoch or interviewed Hoch about the incident. Trial Tr. vol. 2, 103. She "think[s] [Hoch] had a conversation with Pieter Vanderwesthuizen" but has no firsthand knowledge of any conversation between the two. *Id.*

83.     On August 14, 2018, Vanderwesthuizen emailed Franks, noting that Hoch had called him, and wanting to know what steps had to be taken to "finalize this." Franks replied that she would call Hoch the next day, to which Vanderwesthuizen responded "I told [Hoch] that as I understand it, it was a LOtO violation. He agreed - I told him we will contact him tomorrow. We want to terminate him." Franks replied "[w]e are terminating Branndon." Def. Ex. 12B, at 2, ECF No. 29-31.

84.     On August 15, 2018, Franks called Hoch and told him he was terminated from employment with Carpenter, effective that day, for committing the August 9, 2018 lockout/tagout violation, which constituted a catastrophic violation in violation of Carpenter's Non-Compliance

with Safety Standards Policy and Carpenter's Code of Conduct. Hoch received a letter confirming his termination from employment. Trial Tr. vol. 1, 70, 72; Trial Tr. vol. 2, 96; Def. Ex. 13, at 2, ECF No. 29-33.

85.     On August 15, 2018 Hoch emailed Franks, Vanderwesthuizen, and Saul to request a meeting where he could have the "chance to defend [him]self." Hoch asserted that Carpenter "took the Supervisor's word and did not do a full investigation." Def. Ex. 12C, at 2, ECF No. 29-32.

86.     Franks was not concerned about Hoch's claims that he was not given the opportunity to defend himself because Sisko, "[a] supervisor who was there and witnessed the entire event and was also a safety facilitator for 10 years before he was a supervisor" documented the incident. Trial Tr. vol. 2, 105.

87.     In 2014, Carpenter employee Larry Shuman ("Shuman") committed a "catastrophic violation" by violating Carpenter's lockout/tagout protocol. Shuman unlocked and powered up a machine and left the safety gate open while conducting a wheel and guide change, causing the guide to fall off the machine's rollers and injure his left calf. *See* Trial Tr. vol. 1, 10–11 (reciting Stipulation of Counsel).

88.     Shuman received verbal coaching and as of January 30, 2020, remains an active Carpenter employee. *Id.*

89.     In 2016, Carpenter employee, Jason Seidel ("Seidel"), committed a "catastrophic violation" by violating lockout/tagout protocol. Seidel turned off the power switch on a machine's main drive control box but forgot to apply his personal lock to the box and left the machine unlocked while conducting a block change. Carpenter terminated Seidel because of his catastrophic violation. *See* Trial Tr. vol. 1, 12–13 (reciting Stipulation of Counsel 18).

90.    In 2018, until his termination, Hoch earned $64,122 as a Carpenter employee, meaning his average weekly wage at Carpenter in 2018 was $1,985.20, based on his W2 earnings of $64,122 over 32.3 weeks. *See* Joint Trial Ex. 41.

91.    After his termination, Hoch immediately searched for a new job. He was unemployed for about a month before he found a job at Lift, Inc. (misspelled as "Lyft" in the trial transcript), where he is still employed. Trial Tr. vol. 1, 81–82.

92.    Around three months after Hoch's termination from employment with Carpenter, Hoch "wasn't making the same amount of money [he] was making," which "created arguments" with his girlfriend and ended their relationship. Hoch also "ended up starting using nicotine and tobacco to lower some stress levels" and "move[d] back home with [his] mom[,]" which he felt "was kind of not great to do at the age of 27, 28 years old when [he] was out on [his] own." Trial Tr. vol. 1, 81.

93.    Since September 2018, Hoch has worked for Lift, Inc. as a Road Service Technician, with standard working hours that meet his medical restrictions. Hoch is satisfied with his employment at Lift and has "no reason to believe [he] will not work there" for the foreseeable future. *Id.* at 81, 86.

94.    However, Hoch earns less at Lift than he earned at Carpenter. Hoch's average weekly wage at Lift, Inc. in 2018 was $895.20, based on his W2 earnings of $54,937.81 for the entire year. *See* Joint Trial Ex. 41

95.    In 2019, his average weekly wage at Lift, Inc. was $1,056, based on his W2 earnings of $54,937.81 for the full year. Joint Trial Ex. 42.

96.    In 2020, his average weekly wage at Lift, Inc. was $1,186, based on year earnings of $61,685.06 for the full year. Joint Trial Ex. 43.

97.     In 2021, Hoch's average weekly wage at Lift, Inc. was $1,234 based on year-to-date earnings as of April 15, 2021 of $18,509.50.

## II.     CONCLUSIONS OF LAW

We have jurisdiction over this case under 28 U.S.C. § 1331. Venue is proper because Hoch brought this action in the district where Carpenter resides and where a substantial part of the acts giving rise to his claim occurred. 28 U.S.C. §§ 1391(b)(1), 1391(b)(2). Hoch asserts that Carpenter discriminated against him, in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), by terminating his employment because of his epilepsy. Unlawful discrimination includes terminating an individual because of his disability. *See id.* "When a plaintiff attempts to prove a discrimination claim under a pretext theory, the *McDonnell Douglas* burden-shifting framework applies." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir.2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973))

The *McDonnell Douglas* framework imposes the initial burden of putting forth evidence to create a prima facie case on the plaintiff. *Herman v. City of Allentown*, 985 F. Supp. 569, 574 (E.D. Pa. 1997). Plaintiff must put forth evidence showing he (1) has a "disability," (2) is a "qualified individual," and (3) has suffered an adverse employment action because of that disability. *Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir.2000)*.* Where the plaintiff meets his initial burden, an inference of discrimination arises, and the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the employment decision. *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir.1996). Once the employer has produced a legitimate non-discriminatory reason for the employment decision, the inference of discrimination disappears, and the burden shifts to the plaintiff to show the asserted reasons were pretextual. *Id.* at 952.

To show the employer's asserted reasons are merely a pretext for discrimination, a plaintiff must provide evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)).

### A.  Hoch's Prima Facie Case

At trial, Hoch established a prima facie case of discrimination. The parties stipulated that Hoch's epilepsy qualifies as a disability under the ADA, and that Hoch was a qualified individual able to perform the essential job functions with reasonable accommodations, which Carpenter provided to him. We find that Hoch showed he was terminated because of his disability, and accordingly established his prima facie case.

Hoch's termination of employment qualifies as an adverse employment action. *Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012). For Hoch to establish the third prong of his prima facie case, he must have proved that his disability was a "determinative factor" in Carpenter's decision to terminate his employment. *See Watson v. Se. Penn. Transp. Auth.*, 207 F.3d 207, 214–15 (3d Cir. 2000) (holding the term "determinative factor" is appropriate when applying the burden-shifting framework in pretext cases); *see also* Model Third Circuit Civ. Jury Instr. 9.1.2 (2019) (instructing that a plaintiff "must prove that [his/her] [disability] was a determinative factor in [defendant's] decision"). The record must permit the factfinder to determine "that if not for [Hoch's epilepsy] the [termination] would not have occurred." *Id.* Hoch is not required to prove Carpenter Technology acted with the particular intent to violate Hoch's federal rights under the ADA. *Id.* Nor is Hoch required to produce direct evidence of intent, such

17

as statements admitting discrimination. Rather, intentional discrimination may be inferred from the existence of other facts. *Id.*

As an initial matter, to prove discrimination because of disability, the employer must know of the disability. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002) (citation omitted). There is no dispute that Hoch's supervisors knew of his epilepsy. Carpenter knew of Hoch's condition from the time of his diagnosis, or soon after.

As to whether Carpenter terminated Hoch because of his epilepsy, we find Hoch proved that his disability was a determinative factor in his termination. The rapid succession of events leading to his termination coupled with credible testimony from a longtime Carpenter employee, Michael Dreisbach, and the retention of an employee who committed a purportedly similar lockout/tagout violation and yet was not terminated raise the inference of intentional discrimination. We credit Dreisbach's testimony that Carpenter's concern for productivity led it to find reasons to "fire [employees who took FMLA leave] [ ] because of missing so many days . . ." Trial Tr. vol. 2, 12–13, ECF No. 33. In Hoch's case, Carpenter terminated his employment mere days after he informed his supervisor he could not work a shift that violated his permanent medical restrictions, and days after Carpenter issued him a Corrective Performance Review that reiterated seven of the eight absences identified by the March 5, 2018 Corrective Performance Review. Finally, Carpenter's Non-Compliance with Safety Standards policy defines a catastrophic violation as "one which has the potential to create a fatality hazard and/or represents an egregious violation of safe work behavior." Def. Ex. 3E, at 3, ECF No. 29-13. Yet, while Hoch was terminated for a lockout/tagout violation which Sisko, the documenting supervisor, testified he did not think was an egregious violation, a non-disabled Carpenter employee received verbal coaching

for a catastrophic violation where he was actually injured. *See* Trial Tr. vol. 1, 10–11 (reciting Stipulation of Counsel).

### B. Pretext

As Hoch established a prima facie case of disability discrimination, the burden of production shifts to Carpenter to produce a legitimate, nondiscriminatory reason for his termination. Carpenter asserts it terminated Hoch's employment because he committed a catastrophic lockout/tagout violation. Carpenter's asserted justification passes muster. *See Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997)) ("[T]he defendant's burden at this stage is relatively light and . . . it is satisfied if the defendant articulates a legitimate reason for the adverse employment action.").

The only remaining issue is whether Hoch proved Carpenter's asserted reason for his termination was "a pretext, or excuse, for discrimination." Model Third Circuit Civ. Jury Instr. 9.1.2 (2019). To meet that burden, a plaintiff "cannot simply show that the employer's decision was wrong or mistaken." *Fuentes*, 32 F.3d at 765. The plaintiff must provide evidence undermining the employer's proffered reason that is sufficient to "support an inference that the employer did not act for its stated reasons." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995).

Carpenter's Vice President of HR, James America, with whom Franks reviewed any proposed terminations, testified that he understood Hoch was terminated because he committed a "significant catastrophic" lockout/tagout violation. Joint Trial Ex. 55, at 18. America testified that Carpenter follows a standard investigation process after an employee commits a lockout/tagout violation. A "combination of the department manager, supervisor, direct manager . . . and most of

the time, safety" participates in an investigation. *Id.* at 20. America testified that an investigation would "obviously" include witness interviews, including an interview with the responsible Carpenter employee to get his or her side of the story, and consideration of whether there were "breakdowns in the system. Was it a management failure? Did we do proper training?" *Id.* at 21–22. The investigation would take place over the 48-to-72-hour period after an incident or violation. *Id.* at 22. Ultimately, a "boots on the ground" employee who participated in the investigation would determine whether the incident reached the level of a catastrophic violation. *Id.* at 19–20. Under Carpenter's policies, employees were not entitled to appeal Carpenter's decision regarding a catastrophic violation through the Problem Resolution Procedures that applied to non-catastrophic violations.

In Hoch's case, none of the components of an investigation America testified would "obviously" occur took place. Carpenter did not interview Sisko, the only "boots on the ground employee" to witness the incident, or Hoch, the employee responsible for the incident, or conduct any investigation whatsoever. Instead, Franks testified that the decision to terminate was based entirely on Sisko's email documenting the incident. *See* Trial Tr. vol. 2, 105, ECF No. 33. Yet Sisko, who per America's understanding of Carpenter's procedure was the "boots on the ground" employee best situated to categorize the purported violation, testified that he had no role in categorizing Hoch's violation as catastrophic. In fact, Sisko testified that he did not think Hoch's conduct was "egregious" because all keys needed to power the machine down were in the lockbox. Trial Tr. vol. 2, 59–60, 63; *see also* Def. Ex. 14B, at 3, ECF No. 29–35 (identifying a Carpenter employee who was terminated for a "catastrophic" violation after he forgot to apply a lock to a lockbox and left the machine unlocked while he conducted a block change).

In fact, after Sisko sent Hoch to his workstation to retrieve his personal lock, Sisko left the fixed head grinder unmanned to place a call in the parking lot. For ten years, Sisko worked as a safety facilitator for Carpenter. *See* Trial Tr. vol. 2, 32, ECF No. 33. His duties included "perform[ing] audits, look[ing] at procedures, do[ing] walks through the facility, certain specific different tasks per safety to ensure the safety of the people employed [at Carpenter]. *Id.* That eminently qualified Sisko left the fixed head grinder unaccompanied without affixing his personal lock to the lockbox to place his call shows that Sisko did not think Hoch's use of a shop lock on the lockbox "ha[d] the potential to create a fatality hazard and/or represents an egregious violation of safe work behavior." *See* Def. Ex. 3E, at 3, ECF No. 29-13.[1] As Sisko testified, a benefit of using a personal lock over a shop lock is that the unique personal locks permit other employees— for example, after a shift change—to look at the lock and be able to quickly identify which employee performed the lockout. *See* Trial Tr. vol. 2, at 43, ECF No. 33.

Under Carpenter's Non-Compliance with Safety Standards policy, Hoch was entitled to develop a corrective action plan to present to the Vice-President of Manufacturing, the General Manager, and the Department Manager in a planned meeting during his suspension. "[T]he employee will be subject to appropriate corrective action, typically the issuance of two steps of Corrective Performance." Def. Ex. 3E, at 3, ECF No. 29-13. During Hoch's suspension, he had no contact with anyone at Carpenter except for a phone call with Pieter Vanderwesthuizen—which had no effect on Carpenter's decisionmaking—until Franks called Hoch to tell him Carpenter was

---

[1] Given the inconsistencies in Sisko's testimony regarding whether the lockbox was open or shut, *compare* Trial Tr. vol. 2, at 56, ECF No. 33, *with* Def. Ex. 9, at 2, ECF No. 9 (testifying at deposition and trial inconsistently with the incident documentation as to whether Hoch first closed the lockbox or left the lockbox open), and the number of observations Sisko performed before and after his observation of Hoch, on this issue, we credit Hoch's testimony over Sisko's. We find that Hoch affixed his shop lock to the lockbox.

terminating his employment. Because Carpenter characterized his violation as catastrophic, Hoch had no right to appeal Carpenter's decision under its policies.

Carpenter prides itself on being by the book with its policies. It is proactive with trainings and strives to understand any safety lapses to mitigate the risk of future industrial accidents. *See* Trial Tr. vol. 1, 107–08, ECF No. 32; Trial Tr. vol. 2, 7—71, ECF No. 33. We by no means minimize the significance of lockout/tagout violations or disagree that some lockout/tagout violations may call for termination. However, Carpenter's own policies recognize that lockout/tagout violations exist in degrees. In some instances, a catastrophic violation may warrant an immediate termination. But in Hoch's case, Sisko, the on-site supervisor, did not consider his violation catastrophic, or call the violation catastrophic in his contemporaneous memo documenting the incident. Carpenter did not follow any steps of the incident review process America described as the norm. Instead, it jumped to terminate Hoch without any review of the incident, instead relying entirely on Sisko's memo. Carpenter's failure to go by the book in Hoch's case leads us to believe that Hoch's termination was a foregone conclusion from the moment Sisko sent his email documenting the incident. We find that Carpenter "did not act for its stated reasons." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995). Rather, Carpenter's proffered justification, Hoch's "catastrophic violation," was a pretext for discrimination.

## C.  Remedies

Having found that Carpenter discriminated against Hoch, we now consider the remedies to which Hoch is entitled. The ADA's enforcement provision permits the same recovery in ADA actions as in Title VII actions. 42 U.S.C. § 12117 ("The powers, remedies and procedures set forth in . . . [the Title VII remedies provision] shall be the powers, remedies and procedures this title provides to . . . any person alleging discrimination on the basis of disability in violation of any

provision of this Act . . . concerning employment." Successful claimants, therefore, may "recover compensatory and punitive damages as allowed in [§ 1981a(b)] in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent." *Id.* § 1981a(a)(2). In discrimination actions brought under the ADA, the amount of compensatory damages a claimant may recover depends on the number of employees a respondent has. *See id.* § 1981a(b)(3). Such caps do not apply to back pay. *See id.* § 1981a(b)(2).

### 1.   *Back pay and prejudgment interest*

Because back pay is available to a successful Title VII plaintiff, *Spencer v. Wal–Mart Stores, Inc.*, 469 F.3d 311, 315 (3d Cir. 2006) (citing 42 U.S.C. § 2000e–5(g)(1)), backpay is also available to Hoch. *Id.* at 315 n.3 (citing 42 U.S.C. § 12117(a)). The proper method to measure a back pay award is "to take the difference between the actual wages earned and the wages the individual would have earned in the position that, but for discrimination, the individual would have attained." *Gunby v. Pa. Elec. Co.*, 840 F.2d 1108, 1119–20 (3d Cir. 1988).

Hoch testified that he immediately sought work after his termination and was offered at least two different positions. *See* Trial Tr. vol. 1, 81, ECF No. 32. Carpenter presented no evidence to suggest Hoch failed to exercise reasonable diligence in seeking comparable employment. Accordingly, we find that Hoch exercised reasonable diligence in seeking comparable or equivalent employment. *See* ECF Nos. 14 at 30, 18 at 8. We conclude that the appropriate end of the back pay period is the date of verdict, October 13, 2021.

In 2018, Hoch earned an average weekly wage of $1,985.20 at Carpenter. Hoch was unemployed for a month after Carpenter terminated his unemployment, during which he earned nothing. In 2018, Hoch earned $1,090 less per week at Lift than he earned at his job with Carpenter. In 2019, Hoch earned $929.20 less per week at Lift than he earned at Carpenter. In 2020, Hoch

earned $799.20 less per week than he earned at Carpenter. In 2021, Hoch earns on average $751.20 less per week than he earned at Carpenter.

We conclude Hoch is entitled to a back pay award of $144,966.80—his average weekly wage while employed by Carpenter for a period of four weeks of unemployment, plus the difference between the weekly wages he has earned at Lift and the wages he would have earned had he remained employed by Carpenter for a period of 160 weeks.[2]

Plaintiff also seeks prejudgment interest on his back pay award, which is authorized under the ADA. *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 442 (3d Cir. 2009). As with the back pay award, prejudgment interest helps to make victims of discrimination whole. *Booker v. Taylor Milk Co.*, 64 F.3d 860, 868 (3d Cir. 1995). We have discretion over whether to award prejudgment interest and the interest rate to be used. *Marra v. Phila. Hous. Auth.*, 404 F. Supp. 2d 839, 848 n.2 (E.D. Pa. 2005), *aff'd*, 497 F.3d 286 (3d Cir. 2007). We conclude that prejudgment interest on Hoch's back pay award is appropriate in this case, with the amount to be determined based on the parties' submission of the appropriate rate and calculations.

### 2. Front pay

Hoch is entitled to front pay under the ADA. *Herman v. City of Allentown*, 985 F. Supp. 569, 582 (E.D. Pa. 1997). Front pay is particularly appropriate because Hoch's reinstatement at

---

[2] We made the following calculations to arrive at $144,966.80: In 2018, Hoch earned $24,290.80 less at Lift, which we calculated from the sum of $7,940.80 [4 weeks of unemployment] and $16,350 [15 weeks at Lift versus at Carpenter].

In 2019, Hoch earned $48,318.4 less at Lift, which we calculated from the product of $929.2 [2019 earnings at Lift versus Carpenter] and 52 [weeks].

In 2020, Hoch earned $41,558.4 less at Lift, which we calculated from the product of $799.2 [2020 earnings at Lift versus Carpenter] and 52[weeks].

To the date of this verdict, in 2021, Hoch has earned $30, 799.2 less at Lift, which we calculated from the product of $751.2 [2021 earnings at Lift versus Carpenter] and 41[weeks].

Carpenter is not viable given the circumstances of his termination. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). We conclude that Hoch is entitled to front pay, the difference in wages he would have earned per week at Carpenter, for a reasonable period of time. We conclude his economic loss going forward is $39,062.40 per year, the difference between his annual earning at Carpenter and his annual earning at Lift based on his average weekly pay in 2021. Hoch lost a position he liked and found another position he likes, but which pays substantially less than the position he lost. *See* Trial Tr. vol. 1, 82, 86, ECF No. 32. Absent any indication that Hoch's pay differential will narrow significantly, we conclude that front pay for a period of ten years is reasonable given Hoch's youth and his testimony. We will award front pay in the amount of $39,062.40 per year for ten years, for a total of $390,624.

### 3. Compensatory damages

We "may award damages for any pain, suffering, inconvenience, mental anguish, or loss of enjoyment of life" Hoch experienced because of Carpenter's unlawful termination. *See* ECF Nos. 14 at 16, 18 at 22. Compensatory damages must be based on "sound judgment . . . , drawing reasonable inferences from the facts in evidence[,]" and may not be based on "sympathy, speculation, or guesswork." *See id.* For emotional distress damages, there must be "a reasonable probability rather than a mere possibility that damages due to emotional distress were in fact incurred as a result of an unlawful act." *Gagliardo v. Connaught Lab'ys, Inc.*, 311 F.3d 565, 573 (3d Cir. 2002) (citations omitted).

Hoch testified that his lower salary "created arguments" with his girlfriend and ended their relationship. Hoch also "ended up starting using nicotine and tobacco to lower some stress levels" and "move[d] back home with [his] mom[,]" which he felt "was kind of not great to do at the age of 27, 28 years old when [he] was out on [his] own." Trial Tr. vol. 1, 81. Hoch provided no

evidence supporting an award of compensatory damages beyond his testimony regarding his financial and emotional stress. We conclude that Hoch is not entitled to compensatory damages.

### 4. *Punitive damages*

Hoch seeks an award of punitive damages, which are available under the ADA if the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

We conclude that an award of punitive damages would be inappropriate in this case. While Carpenter terminated Hoch's employment because of his disability, Hoch has not introduced any evidence showing that Carpenter had the requisite state of mind. As Hoch has not shown Carpenter "discriminate[d] in the face of a perceived risk that its actions w[ould] violate federal law," a punitive damages award is inappropriate. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999).

### 5. *Attorney's fees*

Hoch is entitled to reasonable attorney's fees and other costs of the action, in an amount to be determined through post-trial motions.

## III.    CONCLUSION

For the foregoing reasons, we conclude that Carpenter discriminated against Hoch under 42 U.S.C. § 12112(a). Accordingly, Hoch is entitled to recovery. We will enter judgment in Hoch's favor in the total amount of $535,590.80, consisting of back pay in the sum of $144,966.80, and front pay in the sum of $390,624, with attorney's fees and costs, and prejudgment interest to be

determined based on post-trial motions. We decline to award punitive damages. An appropriate order follows.

DATED:           OCTOBER 13, 2021                    BY THE COURT:

                                                     /s/ Chad F. Kenney
                                         _____
                                         CHAD F. KENNEY, JUDGE